THOMPSON & KNIGHT LLP
Michael V. Blumenthal, Esq.
Jennifer A. Christian, Esq.
900 Third Avenue, 20th Floor
New York, New York 10022
Tel:  (212) 751-3001
Fax: (212) 751-3113
E-mail: michael.blumenthal@tklaw.com
         jennifer.christian@tklaw.com

*Attorneys for Stabilis Master Fund III, LLC*

Hearing Date: April 23, 2014
Hearing Time:  10:30 a.m.

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re:<br><br>COMMACK HOSPITALITY, LLC,<br><br>                   Debtor. | Chapter 11<br><br>Case No. 14-70931 (AST) |

**OBJECTION OF STABILIS MASTER FUND III, LLC TO DISCLOSURE STATEMENT WITH RESPECT TO PLAN OF REORGANIZATION PROPOSED BY COMMACK HOSPITALITY, LLC**

TO:    HONORABLE ALAN S. TRUST
         UNITED STATES BANKRUPTCY JUDGE

Stabilis Master Fund III, LLC ("Lender" or "Stabilis"), by and through undersigned counsel, hereby objects to the *Disclosure Statement With Respect to Plan of Reorganization Proposed by Commack Hospitality*, dated March 10, 2014 (the "Disclosure Statement") [Docket No. 5].

**PRELIMINARY STATEMENT**

The Disclosure Statement should not be approved because it fails to provide adequate information necessary for stakeholders to assess the merits of the Plan (defined below). Moreover, the Disclosure Statement fails because it describes a Plan that is patently

unconfirmable. In sum, the Debtor has proposed a five (5) year restructuring of its secured debt where its only source of income is generated by a lease with its tenant, which is totally dependent upon a contract from Suffolk County which is a grant to run a homeless shelter expiring in June of 2015. Although the **County** has the sole right to renew the grant for two one-year extensions, the Debtor's future depends solely upon the political vagaries of local government. At bottom, the Debtor's hopes and dreams are unsupported by financial data and reality, do not satisfy the requirements of the Bankruptcy Code and no reasonable assurance of success exists. Additionally, the Disclosure Statement is grossly misleading by omitting salient facts and circumstances as will be more fully described below.

## BACKGROUND

1. On March 10, 2014 (the "Filing Date"), the Debtor filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code and on March 11, 2014, the Debtor filed a plan of reorganization (the "Plan") [Docket No. 6] and related Disclosure Statement.

2. Debtor's primary asset is certain real property known as 801 Crooked Hill Road, Brentwood, New York (the "Property"). The Debtor, in the past, operated a hotel under the Wingate Inn "flag" at the Property, but since April, 2013, the Property has been leased to the Long Island Women's Empowerment Network ("LIWEN") which offers temporary housing for homeless families at the Property pursuant to a contract with Suffolk County. LIWEN pays monthly rent which is currently $247,120 per month; however, without the grant from Suffolk County there would be **no** revenue generated at the Property. LIWEN, as is the Debtor, is wholly dependent on the grant from Suffolk County to fund the homeless shelter, which expires on June 30, 2015 (with two one-year options to renew at the County's option). Other than real estate taxes, LIWEN pays all expenses related to and incurred in connection with the Property.

2

3. On or about August 8, 2008, General Electric Capital Corporation ("Original Lender"), agreed to lend Debtor a sum up to Ten Million Nine Hundred Thousand and 00/100 Dollars ($10,900,000) (the "Loan"), evidenced by that certain Loan Agreement dated as of August 8, 2008 by and between Original Lender and Debtor (as amended from time to time, the "Loan Agreement"). In connection with the Loan, Debtor executed in favor of and delivered to Original Lender a Consolidation, Extension, and Restatement of Notes Agreement, dated August 8, 2008, in the principal sum of Ten Million Nine Hundred Thousand and 00/100 Dollars ($10,900,000) (the "Note"), which is secured by the Property pursuant to that certain Consolidation, Modification, Spreader and Extension Agreement (the "Mortgage"). The loan documents also include an assignment of all rents, leases and revenues entered into and/or generated at the Property.

4. Following certain defaults by Debtor under the Note, Mortgage and Loan Agreement, the Original Lender, Debtor, and various guarantors[1] entered into a series of agreements including, without limitation, the Loan Modification Agreement dated August 31, 2010, the Loan Forbearance Agreement dated October 25, 2011, and the Loan Modification and Forbearance Agreement dated January 23, 2012 (collectively the "Forbearance Documents").

5. The Forbearance Documents provided for a forbearance period, adjusted the interest rate, reserved all rights and remedies with respect to existing defaults, and agreed to forbear from exercising the lender's rights under the Loan Documents during the stated forbearance period, subject to the terms and conditions set forth therein.

---

[1] The guarantors are Nilesh Patel, Viral H. Patel, Sudha P. Patel, Anil K. Sethi, Ashwani K. Sethi, Deepak K. Sethi, Jasu S. Patel, and Jasu S. Patel, in her capacity as Trustee under the Patel Living Trust (collectively, the "Guarantors").

3

6. The Debtor failed to comply with the terms and provisions of the loan documents by, among other things, failing to pay taxes for the 2010/2011 tax year, leasing the Property to LIWEN and converting the Property for a use other than as a Wingate hotel, and failing to repay the entire indebtedness under the loan documents during the forbearance period.

7. Stabilis is the current owner and holder of the Note, Mortgage and underlying loan documents by virtue of assignments and allonges executed and delivered by the Original Lender on or about June 28, 2013.

8. Debtor's breaches of the Note, Mortgage and underlying loan documents remained and have not been cured as of the Filing Date.

9. Stabilis is the current plaintiff in a mortgage foreclosure action that was commenced against the Property, in Suffolk County Supreme Court (the "State Court"), under Index No. 060556/2013 (the "Foreclosure Action"), prior to the Filing Date.

10. At a hearing on July 11, 2013, the State Court granted Stabilis' motion for the appointment of a rent receiver, and on August 16, 2013, the State Court signed an Amended Order Appointing Receiver appointing D. Daniel Engstrand, Esq. as rent receiver (the "Receiver") for the Property in the Foreclosure Action.

11. Over the course of the Receivership, the Receiver collected rents from LIWEN. In addition, the Receiver (i) negotiated an installment agreement for the payment of past-due 2012 real estate taxes[2], (ii) effectuated the full payment of past-due 2012 real estate taxes, and (iii) negotiated an installment agreement for the payment of past-due 2013 real estate taxes.

---

[2] The past due 2011 real estate taxes were advanced by Stabilis prior to the appointment of the Receiver in the Foreclosure Action.

12. The Receiver established an operating account for the Property for the collection of rents and payment of expenses (the "Receiver's Operating Account"). Currently, there is approximately $661,427.61 in the Receiver's Operating Account.[3]

13. Stabilis moved for summary judgment in the Foreclosure Action on or about January 17, 2014. Pursuant to an agreed upon briefing schedule, the time for the Debtor to respond to the summary judgment motion was March 11, 2014; however, it did not file responsive pleadings. Instead, the Debtor filed the instant Chapter 11 case solely in an effort to frustrate Stabilis' state law remedies.

14. As of the Filing Date, Debtor was indebted to Stabilis in an amount not less than $12.5 million. Debtor has acknowledged, in the Adequate Protection Stipulation described below, that Stabilis holds a valid, perfected and enforceable first priority blanket lien on and security interest in the Property, the lease with LIWEN and the rents, revenues and proceeds therefrom (collectively, the "Pre-Petition Collateral").

15. On April 10, 2014, Debtor and Stabilis entered into a stipulation and order (the "Adequate Protection Stipulation") providing for the turnover of sums held by the Receiver in the Receiver's Operating Account, as well as all other Cash Collateral (as such term is defined in the Adequate Protection Stipulation), and the use of Cash Collateral according to the terms and conditions as set forth therein. A hearing on the motion seeking Court approval of the Adequate Protection Stipulation is scheduled for April 23, 2014.

16. Debtor's Section 341 meeting of creditors was conducted on April 11, 2014. Mr. Viral H. Patel and Mr. Nilesh Patel, both managing members of Debtor, testified under oath

---

[3] Upon information and belief, the April 2014 rent in the amount of $228,000 is being held in escrow by LIWEN's counsel, Bradley D. Schnur, Esq., pending entry of an order approving the Adequate Protection Stipulation.

regarding the information (or lack thereof) of Debtor's petition, schedules, statement of financial affairs and as to the business plans of the Debtor.

## ARGUMENT

I. **THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT FAILS TO PROVIDE ADEQUATE INFORMATION.**

17. The Court may not approve a disclosure statement unless it includes "adequate information." 11 U.S.C. § 1125(b). "Adequate information" is defined as "information of a kind, and in sufficient detail ... that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). Proper disclosure is "[a]t the 'heart' of the chapter 11 process." *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).

18. The primary purpose of a disclosure statement is to give creditors the information necessary to decide whether to accept or reject a proposed plan. *See, e.g., Kunica v. St. Jean Financial, Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and this court.") (quoting *Oneida Motor Freight Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988)). Accordingly, a disclosure statement must contain "simple and clear language delineating the consequences of the proposed plan on [creditors'] claims...."

19. A disclosure statement should not be approved if it lacks adequate information or "points a positive and misleading picture." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988) (disapproving disclosure statement because it "paints a positive and misleading picture" with regard to creditors' recoveries under the proposed plan). Precisely what constitutes adequate information in any particular instance will be determined on a case-by-case

basis. *See C.J. Kirk v. Texaco, Inc.*, 82 B.R. 678, 682 (S.D.N.Y. 1988); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. at 979.

    20.    The Disclosure Statement fails to provide adequate information as it:

(a) Fails to disclose that the initial term of the Suffolk County contract with LIWEN, upon which the entire Plan hinges, will expire on June 30, 2015, a mere 13 months from the anticipated hearing on the Disclosure Statement, and the County may not renew the contract;[4]

(b) Fails to disclose (i) that the current exercise price for the LIWEN option to purchase the Property is $15.2 million; and (ii) any discussions it has been having with LIWEN regarding whether or not LIWEN intends to exercise the option;

(c) Fails to contain projections of future cash flow requirements of the Debtor;

(d) Fails to contain a liquidation analysis;

(e) Fails to contain any support, such as an appraised value or a copy of an appraisal, for the value attributed to the Property;

(f) Fails to contain any information as to whether the Debtor has previously attempted to market the Property for sale or any future marketing plans;

(g) Fails to disclose any efforts or failure to obtain refinancing of the Property;

(h) Fails to inform creditors of Debtor's purported management agreement with JASP, the amounts which Debtor allegedly owes to JASP under such agreement, and Debtor's intention to dispute both the validity of such agreement and alleged amounts due under such agreement. At the 341 meeting, Messrs. Patel testified that JASP never rendered, nor does it currently render any services, management or otherwise, to Debtor. Thus, the nature, purpose and rationale for the "management agreement," which gives rise to the largest unsecured claim in this case in an amount of $1.6 million remains a mystery;

(i) Fails to advise the Court, creditors and parties-in-interest that the unsecured claims pool of approximately $2.3 million was significantly inflated with the inclusion of the JASP "claim" and, that, if JASP's claim is not included in the claims pool, this is essentially a two-party dispute between Debtor and Stabilis;

---

[4] Attached hereto as <u>Exhibit A</u> is a copy of the executed cover sheet of Suffolk County's contract with LIWEN.

7

(j) Fails to describe or correct the following additional deficiencies in the Plan that render the Plan unconfirmable:

(i) Provides for monthly payments to Stabilis an account of its Secured Claim only after and if LIWEN pays its rent;

(ii) Fails to require payment of any sale proceeds to Stabilis as payment under the Plan. For instance, if LIWEN exercises its purchase option or the Property is sold to a third party, the Plan proposes to force Stabilis to accept any purchaser of the Property as a new obligor, while the equity security holders of the Debtor collect the proceeds;

(iii) Fails to provide for Stabilis to be paid post-petition interest while junior stakeholders are receiving or retaining value under the Plan. See Section 6.4 of the Plan;

(iv) Fails to provide for an appropriate rate of interest on Stabilis' claims from Confirmation of the Plan and on and after the Effective Date;

(v) Provides that all claims that are Disputed Claims shall not be paid any distributions unless and until the Disputed Claim becomes an Allowed Claim;

(vi) Provides that interest shall not accrue or be paid on any Disputed Claim for the period from the Filing Date to the date a distribution is made when and if such Disputed Claim becomes an Allowed Claim; and

(vii) Appears to improperly attempt to cancel or modify the guarantees provided to Stabilis by non-Debtor guarantors and provides for the release of and/or injunction against such non-Debtor guarantors.

21. Based upon the foregoing, the Disclosure Statement does not contain adequate information and is misleading. Therefore, it should not be approved.

## II. THE PLAN IS FACIALLY NONCONFIRMABLE, AND, THEREFORE, APPROVAL OF THE DISCLOSURE STATEMENT CAN SERVE NO REAL PURPOSE AND WILL MERELY BE A WASTE OF JUDICIAL AND CREDITOR RESOURCES.

22. It is well established that a disclosure statement relating to a plan that is facially nonconfirmable cannot be approved as containing "adequate information" as defined in section 1125 of the Bankruptcy Code. It is black-letter law that disapproval of the adequacy of a

disclosure statement may be "appropriate where it describes a plan of reorganization which is so fatally flawed that confirmation is impossible." *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) (citations omitted). S*ee also, In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re Eastern Maine Elec. Co-op., Inc.* 125 B.R. 329, 333 (Bankr. D. Me. 1991). Consequently, it has been held that

> [i]f, on the face of the plan, the plan could not be confirmed, then the Court will not subject the estate to the expense of soliciting votes and seeking confirmation ... If the Court can determine from a reading of the plan that it does not comply with [section] 1129 of the Bankruptcy Code, then it is incumbent upon the Court to decline approval of the disclosure statement and prevent diminution of the estate.

*In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986).

23. In light of certain statutory deficiencies of the Plan, it is wasteful for this Court to defer consideration of this objection or to approve the adequacy of the information contained in the Disclosure Statement, even if the Court were to conclude that the disclosures therein are adequate within the meaning of section 1125 of the Bankruptcy Code. *See Id.; See also, In re McCall*, 44 B.R. 242, 244 (Bankr. E.D. Pa. 1984); *In re Kehn Ranch, Inc.*, 41 B.R. 832, 832-33 (Bankr. D. S.D. 1984). Approval of the Disclosure Statement will not benefit the Debtor's estates or creditors, nor will such approval expedite the Debtor's emergence from chapter 11. Rather, approval of the Disclosure Statement will only serve to waste the time of the Court and parties in interest and delay the reorganization effort and the development of a confirmable plan at a cost to creditors. *See In re Valrico Square Ltd. P'ship*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990)(citations omitted). As described below, the Plan is patently unconfirmable.

24. It is axiomatic that a court can confirm a plan only if each of the requirements in Bankruptcy Code section 1129 is met. Here, the Plan described in the Disclosure Statement suffers from fatal flaws and does not fulfill the requirements for confirmation set forth in Section

1129. Debtor cannot meet its burden, thereby rendering the Plan unconfirmable. Thus, the Disclosure Statement should not be approved.

### A. The Plan Is Not Feasible and Violates 11 U.S.C. § 1129(a)(11) Because It Is Highly Speculative.

25. 11 U.S.C. § 1129(a)(11) requires a plan to be "feasible." Pursuant to this section, a plan is deemed feasible if, post-confirmation, it "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor…unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). Thus, the Plan must be scrutinized to determine if there is a "reasonable assurance of success." *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988).

26. Courts consider a number of factors in making a feasibility determination: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 151 (Bankr. S.D.N.Y. 1984) (quoting *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr. D. N.J. 1980)). This list of factors is not exhaustive or exclusive, however. *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 763 (Bankr. S.D.N.Y. 1992).

27. Feasibility determinations "must be firmly rooted in predictions based on objective fact." *In re Danny Thomas Props. II L.P.*, 241 F.3d 959, 964 (8th Cir. 2001)(citations omitted). A plan premised upon visionary promises or a hopeful turn of events does not satisfy the Section 1129(a)(11) feasibility standard. *See Pizza of Hawaii, Inc. v. Shakey's Inc. (In re*

*Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985); *In re Sound Radio, Inc.*, 93 B.R. 849, 855 (Bankr. D. N.J. 1988) (quoting *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985)).

28.   Here, the Plan proposes to pay Stabilis over a time period that extends beyond the term of the Suffolk County grant, with a future balloon payment from a sale or refinance at a time when the Property will generate zero income. Therefore, most if not all payments to be made to Stabilis under the Plan are highly unlikely. The Plan is highly speculative as it is wholly dependent on the Suffolk County contract which expires on June 30, 2015, and may not be renewed by the County. Even if it is renewed, there are only two one-year options, wholly within the County's discretion. Additionally, the Debtor has virtually no capital and without funding from the County has no ability to convert a homeless shelter into an income producing business, which would take several million dollars and a lengthy construction period during which time the Debtor would generate no revenue. Absolutely no pertinent financial information has been provided with the Disclosure Statement on any of these issues because none exist. The Debtor has the burden of proof and the Court and creditors are entitled to facts and proof, not just unsupported statements and wishful speculation.

29.   Because the Plan is totally speculative, it is not feasible as a matter of law. Therefore, the Plan violates Section 1129(a)(11), is patently unconfirmable, and the Disclosure Statement should not be approved.

**B.    The Plan Was Not Proposed In Good Faith**

30.   A plan which has not been proposed in good faith is patently unconfirmable. *See, e.g., In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001) ("In order for a court to confirm a plan it must be 'proposed in good faith and not by any means forbidden by law.'")

31. Debtor seeks patently improper treatment of claims and creditors under the Plan. For example, at Section 2.1(vii) of the Plan, it appears that the Debtor is proposing to have the absolute right to force Stabilis to accept a new obligor upon a sale of the Property, rather than paying the proceeds of any sale to Stabilis. Thus, Debtor is proposing that it can sell the Property and not pay the balance due on Stabilis' claims. This will allow equity to get paid prior to Debtor's secured creditor, which violates any notion of good faith and is strong evidence of bad faith.

32. Additionally, it appears that the Plan provides for the cancellation of non-Debtor guarantees and/or a discharge of and injunction against non-Debtor guarantors. For instance, Section 10.3 of the Plan provides:

> "Except as otherwise set forth in this Plan, and except for purposes of evidencing a right to a Distribution, on the Effective Date, all agreements and other documents evidencing the Claims or rights of any Holder of a Claim against the Debtor, including all notes, guarantees, mortgages, and all Interests shall be cancelled."
>
> *See, also, Sections 5.4 and 5.5 of the Plan.*

This is patently improper and contrary to law. Under the loan documents, by virtue of the bankruptcy filing, the Debtor's principals are personally liable for the debt. The Debtor fails to establish that the Chapter 11 reorganization of this single-asset debtor is the sort of "rare" or "truly unusual" case in which a non-debtor release is warranted. The Lender does not consent to the releases. The Debtor's principals are not, in exchange for their releases, creating any fund by which enjoined claims are to be paid. A release or injunction under these circumstances is not allowed and would be unprecedented. *See In re Metromedia Fiber Network, Inc.*, 416 F.3d at 143 ("a nondebtor release is not adequately supported by consideration simply because the nondebtor contributed something to the reorganization and the enjoined creditor took something out"). Accordingly, Debtor's principals and guarantors are not entitled to a discharge, release or

injunction under the Plan. *See also* 11 U.S.C. § 524(e); *see also In re Conston, Inc.*, 181 B.R. 769, 773 (D. Del. 1995); *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002) (injunction of a non-consenting creditor's claim against a non-debtor is "not consistent" with the Code); *In re New Towne Development, LLC*, 410 B.R. 225 (Bankr. M.D. La. 2009) (denying confirmation of a plan which provided for an injunction against guarantors in a single asset real estate case); *Credit Suisse First Boston Mortgage Capital LLC v. Cohn*, 2004 U.S. Dist. LEXIS 16577 (S.D.N.Y. 2004); *Live Nation Worldwide, Inc. v. GTA, Inc.*, 2007 U.S. Dist. LEXIS 37375 (S.D.N.Y. May 18, 2007). As such, the following language should be added to the Plan and Disclosure Statement:

> "Notwithstanding any other provision of this Plan, nothing herein shall effect a release of any claim of Stabilis or any of its affiliates, successors or assigns, arising out of or under the Guaranty executed by the Guarantors dated August 8, 2008 (the "Guaranty"), nor shall anything herein enjoin Stabilis or any of its affiliates, successors or assigns from bringing any claim, suit or action or other proceeding against the Guarantors under or arising out of the Guarantees."

### C.   The Plan is Not Fair and Equitable.

33. Stabilis does not intend to vote in favor of the Plan, as currently proposed, and will object to same. Therefore, even if the Debtor obtains the affirmative votes of an impaired accepting class and meets all the necessary requirements of 11 U.S.C. § 1129(a), the Plan can only be confirmed if it satisfies the cram down requirements of 11 U.S.C. § 1129(b). Thus, the Plan can only be confirmed if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." *Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 (1999) (*quoting* 11 U.S.C. § 1129(b)(1)).

34. 11 U.S.C. § 1129(b)(2) sets forth the requirements to treat a dissenting impaired class fair and equitably, and provides, with respect to a secured creditor, as follows:

(A)(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;...

Or

(iii) for the realization by such holders of the indubitable equivalent of such claims.[5]

11 U.S.C. § 1129(b)(2)(A).

35. A plan which does not meet the standards set forth in § 1129(b)(2) cannot be fair and equitable. However, technical compliance with all the requirements of § 1129(b)(2) does not ensure that a plan is "fair and equitable"... Section 1129(b)(2) sets minimal standards plans must meet. *In re D&F Constr., Inc.*, 865 F.2d 673, 675 (5th Cir. 1989) (internal citations omitted). *See also In re 20 Bayard Views, LLC*, 445 B.R. 83, 105 (Bankr. E.D.N.Y. 2011) (noting such "requirements establish a floor, and satisfaction of these requirements does not guarantee that the plan will meet the fair and equitable standard.").

36. For the reasons set forth below, the Plan is not fair and equitable with respect to Stabilis. Therefore, the Plan violates Section 1129(b)(2), is patently unconfirmable, and the Disclosure Statement should not be approved.

---

[5] 11 U.S.C. § 1129(b)(2)(A)(ii) pertains to the sale of the secured creditor's collateral under a plan, and, since no sale is contemplated under the Plan, such section is irrelevant here. That said, the Plan needs to also contain a provision regarding a potential sale which would require payment of Stabilis' claim in full. Alternatively, Stabilis should retain the right to credit bid at any subsequent sale.

i. **The Plan Is Not Fair And Equitable Because It Does Not Provide For Payment Of The Present Value Of Stabilis' Claims And It Fails To Provide Stabilis With An Adequate Rate Of Interest With Respect To Its Claims.**

37. Section 1129(b)(2)(A)(i)(II) requires that Stabilis receive "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holders' interest in such property." The Debtor's proposal to pay an interest rate of 4.5 percent (4.5%) on Stabilis' claims facially fails to meet the requirement that the payment stream under the proposed Plan equal the present value of the claims. Stabilis submits that the interest rate of 4.5 percent (4.5%) that has been proposed by the Debtor is far too low for the amount of risk involved here.

38. The "formula approach", adopted by the Supreme Court in the chapter 13 case of *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), used the national prime rate and added an appropriate risk adjustment. The Supreme Court determined that it was very necessary to add the appropriate risk adjustment, particularly "[b]ecause bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers." *Id.* In applying the formula approach, the Supreme Court noted that factors such as "the circumstances of the estate, the nature of the security and the duration and feasibility of the reorganization plan" are among the considerations a bankruptcy court should review in determining the size of the risk adjustment to the prime interest rate. *See id.*

39. The Supreme Court acknowledged that a somewhat different analysis might be required in Chapter 11 – that due to the existence of a market for cram down loans in Chapter 11 cases, it may be appropriate for a court to determine the rate of interest in an "efficient" market, assuming such a market exists. *Id.* at 476 n.14.

40. In one of the first Circuit Court decisions to consider the interest rate issue in the context of Chapter 11 after *Till*, the Sixth Circuit declined to "blindly adopt Till's endorsement of the formula approach for Chapter 13 cases in the Chapter 11 context." *Bank of Montreal v. Official Committee of Unsecured Creditors (In re American HomePatient, Inc.)*, 420 F.3d 559, 568 (6th Cir. 2005). Rather, it found that in a Chapter 11 case, if an "efficient" market exists, then the market interest rate should apply, but if there is no efficient market, then Till's formula approach should be used. *See id.*

41. Since then, a number of courts, including courts in this Circuit, have followed the Sixth Circuit's *American HomePatient* decision by attempting to locate a market for the proposed loan, and if no efficient market exists, by employing a formula approach that includes the necessary risk adjustments. *See, e.g., In re 20 Bayard Views, LLC*, 445, B.R. 83, 107-09 (Bankr. E.D.N.Y. 2011); *In re Cantwell*, 336 B.R. 688, 693 (Bankr. D. N.J. 2006); *In re S. Canaan Cellular Investments, Inc.*, 427 B.R. 44, 78 (Bankr. E.D. Pa. 2010).

42. Therefore, assuming this is the analysis this Court will employ, at the Confirmation Hearing, the Court will need to determine whether an "efficient" market exists, and, if an "efficient" market does not exist, then a "formula approach" should be applied, which begins with the national prime rate, and is adjusted upward based upon the various risks present. *See Till*, 541 U.S. at 478-479; *In re Griswold Bldg.*, 420 B.R. 666, 693 (Bankr. E.D. Mich. 2009).

43. The rate proposed here is not sufficient for a number of reasons. The proposed risk adjustment is not reasonable because the Plan is highly speculative based on the following: (a) the initial term of the Suffolk County contract with LIWEN, upon which the entire Plan hinges, expires in thirteen (13) months and the County may not renew the contract; (b) LIWEN

may not exercise its purchase option; (c) it is unlikely that the Debtor will be able to otherwise sell or refinance the Property at the end of the installment period which runs two (2) years beyond the Suffolk County grant, even if the County excises its extension options; and (d) to the extent LIWEN's contract with Suffolk County is not renewed and Debtor is forced to convert the Property back to a hotel, it is highly unlikely that it will be able to obtain the significant amount of funding that would be necessary to implement the conversion, plus refinance the Stabilis indebtedness. It is noteworthy that the stated interest rate in the Modified Loan and Forbearance Agreement is approximately 7.4%, and lending rates were approximately the same then as they are now.

44. This Debtor's business, which is comprised of a single asset with a single tenant wholly dependent upon grants from Suffolk County which may expire in thirteen (13) months, is speculative and traditional financing sources, let alone hard money lenders, are unlikely to provide financing.

45. Importantly, where a debtor does not propose a sufficient interest rate in its plan, it is incumbent upon the bankruptcy court to deny confirmation of the plan, rather than rewrite the plan and adjust the Debtor's proposed interest rate. *See, e.g., 20 Bayard Views*, 445 B.R. at 113; *Griswold*, 420 B.R. at 710.

46. Given that Debtor fails to propose a sufficient interest rate, the Plan violates Section 1129(b)(2), is patently unconfirmable, and the Disclosure Statement should not be approved.

## CONCLUSION AND RESERVATION OF RIGHTS

47. For the reasons stated herein, Stabilis respectfully requests that this Court deny the approval of the Disclosure Statement, or, in the alternative, require the Debtor to modify the Disclosure Statement and Plan to correct the deficiencies described above. It is unreasonable to

assume, let alone have creditors bear the sole risk, that the Debtor will be able to sell or refinance the Property at a time when there is no grant from Suffolk County and/or the LIWEN lease no longer exists.

48. As a matter of public policy and judicial economy, the Disclosure Statement should not be approved as it fails to contain adequate information and the accompanying Plan is not confirmable on its face.

49. Stabilis hereby expressly reserves all of its rights under the Bankruptcy Code and/or otherwise with respect to the Disclosure Statement and Plan (as such may be amended, modified or supplemented), and any other or new disclosure statement or plan that the Debtor may file, including, but not limited to, the right to make the election under § 1111(b) of the Bankruptcy Code and the right to assert any and all objections it may have to confirmation of the Plan.

WHEREFORE, Stabilis respectfully requests that the Court enter an order (i) deeming the Disclosure Statement inadequate unless the Disclosure Statement and Plan are modified to correct the deficiencies described herein, and (ii) granting such other and further relief as this Court deems just and proper.

Dated:  April 16, 2014                                  Respectfully submitted,

                                                        /s/ Michael V. Blumenthal
                                                        Michael V. Blumenthal
                                                        Jennifer A. Christian
                                                        THOMPSON & KNIGHT LLP
                                                        900 Third Avenue, 20th Floor
                                                        New York, New York 10022
                                                        Tel:  (212) 751-3001
                                                        Fax: (212) 751-3113
                                                        E-mail:  michael.blumenthal@tklaw.com
                                                                    jennifer.christian@tklaw.com

                                                        *Attorneys for Stabilis Master Fund III, LLC*

# EXHIBIT A

Rev. 9/04/12; Law No. 17-SS- 011
Shelter Services for Homeless Families and/or Single Adults
L.I. Women's Empowerment Network, Inc.

Agreement No. 001-6109-4690-65-00045
Term: 2/01/13 – 6/30/15

## Shelter Services for Homeless Families and/or Single Adults Contract

This Contract ("the Contract") is between the **County of Suffolk** ("the County"), a municipal corporation of the State of New York, acting through its duly constituted **Department of Social Services** ("the Department"), located at 3085 Veterans Memorial Highway, Ronkonkoma, New York 11779 (mailing address: Box 18100, Hauppauge, New York 11788-8900), and

**L.I. Women's Empowerment Network, Inc.** ("the Contractor"), a not-for-profit corporation organized under the laws of the State of New York, having its principal place of business at 29 First Street, Central Islip, NY 11722-.

The parties hereto desire to make emergency housing services ("the Services") available to the County, in facilities ("Shelters") operated by the Contractor for individuals or families without permanent housing.

Term of Contract:	February 1, 2013 through June 30, 2015, with two one-year options to renew at the County's option.

Total Cost of Contract:	Shall be on a fee-for-service basis as set forth on the Rate Sheet attached as Article I-A.

Terms and Conditions:	Shall be as set forth in Articles I and II, and Exhibits 1 and 2, attached hereto and made a part hereof.

In Witness Whereof, the parties hereto have executed this Contract as of the latest date written below.

L.I. Women's Empowerment Network, Inc.
Signature: _Julie Levine_
Print Name: Julie Levine
Fed. Tax ID #: 27-0169183
Date: Jan 29, 2013

Julie Levine hereby certifies under penalties of perjury that I am an officer of L.I. Women's Empowerment Network, Inc., that I have read and I am familiar with §A5-7 of Article V of the Suffolk County Code, and that L.I. Women's Empowerment Network, Inc. meets all requirements to qualify for exemption thereunder.

Signature: _Julie Levine_
Date: Jan 29, 2013

**Approved As To Legality:**
Paul J. Margiotta
Chief Deputy County Attorney

By: _Patricia M. Jordan_
Patricia M. Jordan
Assistant County Attorney

Date: 1/30/13

County of Suffolk
By: _____
Name: Dennis M. Cohen
Title: Chief Deputy County Executive
Date: 1/31/13

**Department of Social Services**
Approved:
By: _____
For the Commissioner
Theresa M. Pace
Director of Information Management
Date: 30 Jan 2013

Recommended:
By: _Susan Westergaard_
~~Robin Barnett~~ Susan Westergaard
~~Division Administrator~~ Social Services Examiner IV
Housing and Employment Services
Date: 1/29/13

18703