**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Commack Hospitality, LLC. | Case No. 14-70931 (AST) |
| Debtor. | |

**SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO**
**PLAN OF REORGANIZATION PROPOSED BY COMMACK HOSPITALITY, LLC**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Laurence May, Esq.
Mark Tsukerman, Esq.
900 Third Avenue
New York, NY 10022
(212) 752-8000
Fax: (212) 752-8393

**COUNSEL FOR COMMACK HOSPITALITY, LLC**

Dated: June 16, 2014

## I. INTRODUCTION

Commack Hospitality LLC (the "Debtor" or "Proponent") submits this Disclosure Statement with respect to the Plan of Reorganization proposed by the Proponent dated March 10, 2014 (the "Plan"). This Disclosure Statement is to be used in connection with the solicitation of votes on the Plan. A copy of the Plan is attached hereto as Exhibit A. Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed thereto in the Plan (see Article I of the Plan entitled "Definitions, Construction and Interpretation") or if not otherwise defined by the Plan, in the Bankruptcy Code.

For a summary of the proposed treatment of your Claim or Interest under the Plan, please see pages 5-9 below.

## II. NOTICE TO HOLDERS OF CLAIMS AND INTERESTS

The purpose of this Disclosure Statement is to enable Holders of Claims against and Interests in the Debtor whose Claims and Interests are impaired under the Plan and are entitled to vote on the Plan to make an informed decision in exercising their right to vote to accept or reject the Plan.

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT CAREFULLY.

On _______________, 2014, the Bankruptcy Court conducted a hearing on the adequacy of this Disclosure Statement and subsequently entered an order pursuant to section 1125 of the Bankruptcy Code (the "Disclosure Statement Order") approving this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor, typical of the solicited Holders of Claims against and Interests in the Debtor, to make an informed judgment with respect to the acceptance or rejection of the Plan. A copy of the Disclosure Statement Order is included in the materials accompanying this Disclosure Statement. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR MERITS OF THE PLAN.

Each Holder of a Claim or Interest entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Proponent and its Professionals, no Person has been authorized to use or promulgate any information concerning the Debtor, its business, or the Plan, other than the information contained herein, in connection with the solicitation of votes to accept or reject the Plan. No Holder of a Claim or Interest entitled to vote on the Plan should rely upon any information relating to the Debtor, its business, or the Plan other than that contained in the Disclosure Statement and the exhibits hereto. Unless otherwise indicated, the sources of all information set forth herein are the Proponent, its Professionals and matters of record in the Debtor's chapter 11 case.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot and returning the same, to the address set forth on the Ballot, in the enclosed return envelope or by facsimile to the number indicated on the Ballot so that it will be received by the Balloting Agent, Cole, Schotz, Meisel, Forman & Leonard, P.A., Attn: Mark Tsukerman, Esq., 900 Third Avenue (16th Floor), New York, NY 10022 no later than 5:00 p.m. Eastern Time on _______________, 2014.

If you do not vote to accept the Plan, or if you are not entitled to vote on the Plan, you may be bound by the Plan if it is accepted by the requisite Holders of Claims or Interests. See "Solicitation of Votes; Voting Procedures," "Vote Required for Class Acceptance," and "Cramdown" in Article VI, Sections A and C.

**TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 5:00 P.M. EASTERN TIME ON ___________ 2014.** For detailed voting instructions and the name, address, and phone number of the person you may contact if you have questions regarding the voting procedures, see "Ballots and Voting Deadline" and Article VI, Section A.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a Confirmation Hearing to consider Confirmation of the Plan (the "Confirmation Hearing") commencing on _______________, **2014, at 10:00 a.m. Eastern Time**, in the United States Bankruptcy Court for Eastern District of New York, Alfonse M. D'Amato Federal Courthouse, 240 Federal Plaza, Central Islip, NY 11722. **The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan be filed and served on or before _______________, 2014 at 5:00 p.m. Eastern Time**, in the manner described in Article VI, Section B below under the caption, "Confirmation Hearing."

**THE PROPONENT SUPPORTS CONFIRMATION OF THE PLAN AND URGES ALL HOLDERS OF IMPAIRED CLAIMS AND INTERESTS TO ACCEPT THE PLAN**.

## III. EXPLANATION OF CHAPTER 11

### A. Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11, a debtor in possession attempts to reorganize its business for the benefit of the debtor, its creditors, and other parties in interest.

The commencement of a chapter 11 case creates an estate consisting of all the legal and equitable interests of the debtor in property as of the date the bankruptcy petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. In the present chapter 11 cases, the Debtors have remained in possession of their property and continued to operate their businesses as debtors in possession.

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, *inter alia*, for an automatic stay of all attempts to collect prepetition claims from the debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

The formulation and confirmation by the Bankruptcy Court of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the claims against and interests in a debtor. Generally, unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case (the "Exclusive Period"). However, section 1121(d) of the Bankruptcy Code permits the court to extend or reduce the Exclusive Period upon a showing of "cause." After the Exclusive Period has expired, a creditor or any other party in interest may file a plan, unless the debtor has filed a plan within the Exclusive Period, in which case, the debtor is generally given 60 additional days (the "Solicitation Period") during which it may solicit acceptances of its plan. The Solicitation Period may also be extended or reduced by the court upon a showing of "cause."

## B. Plan of Reorganization

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a liquidation of the debtor's assets. After a plan of reorganization has been filed, certain holders of claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of a proposed plan, section 1125 of the Bankruptcy Code requires the plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical investor to make an informed judgment about the plan. This Disclosure Statement is presented to Holders of Claims against and Interests in the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

If all classes of claims and interests accept a plan of reorganization, the bankruptcy court may nonetheless deny confirmation of the plan unless the court independently determines that the requirements of section 1129 of the Bankruptcy Code have been satisfied. Section 1129 sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests" test and be "feasible." The "best interests" test requires that the value of the consideration to be distributed to the holders of claims and interests under a plan may not be less than those parties would receive if the debtor were liquidated in a hypothetical liquidation under chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, the court must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization.

The Proponent believes that the Plan satisfies all applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the "best interests of creditors" test and the "feasibility" requirement. The Proponent supports confirmation of the Plan and urges all holders of impaired Claims and Interests to vote to accept the Plan.

Chapter 11 does not require that each holder of a claim against or interest in a debtor vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan. At a

minimum, however, the plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting in at least one class of impaired claims under the plan. The Bankruptcy Code defines acceptance of the plan by a class of interests (equity securities) as acceptance by Holders of two-thirds of the number of shares actually voting. In the present case, only the holders of impaired Claims or Interests who actually vote will be counted as either accepting or rejecting the Plan.

Classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity or payment in full in cash. Claims against the Debtor in Classes I and II are impaired under the Plan and the Holders of those Claims are thus entitled to vote on the Plan. Interests in the Debtor in Class III are not impaired under the Plan, and the Holders of those Interests are thus not entitled to vote on the Plan and are deemed to have accepted the Plan. Administrative Expense Claims, Priority Claims and the Suffolk County Unclassified Claim are unclassified; their treatment is prescribed by Plan, consistent with the Bankruptcy Code. The Holders of such Claims are not entitled to vote on the Plan.

The bankruptcy court may also confirm a plan even though fewer than all the classes of impaired claims and interests accept it. For a plan to be confirmed despite its rejection by a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class of rejecting claims if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will, *inter alia*, receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or realize the indubitable equivalent of its secured claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property at all unless all senior classes are paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims if: (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims, and (b) no senior class of claims is to receive more than 100% of the amount of all allowed claims in such class.

The Proponent believes that the Plan has been structured so that it will satisfy these requirements as to any rejecting Class of Claims and can therefore be confirmed, if necessary, even if not accepted by all voting Classes of Claims. The Proponent reserves the right to request confirmation of the Plan under the "cramdown" provisions of section 1129 of the Bankruptcy Code.

## IV. SUMMARY OF THE PLAN

### A. General Overview

Commack, as the Plan Proponent, believes, and will demonstrate at the Confirmation Hearing, that confirmation and consummation of the Plan are in the best interests of Holders of Claims against and Interests in the Debtor. In broad terms, the Plan provides for the payment, over five years, of the Allowed Claim of the Secured Creditor, plus interest from the Effective Date[1] at the rate of 4.5% per annum. The Secured Creditor will retain its lien on the Property and will receive on account of its Allowed Claim, deferred cash payments totaling at least the Allowed amount of its claim as of the Effective Date of the Plan. In addition, on the Effective Date, the Secured Creditor will receive Available Cash which Commack estimates will be approximately [$700,000]. Payment of the Available Cash will reduce the Allowed Amount of the Secured Claim. In the event of the exercise of the LIWEN Option, at the closing, or as soon thereafter as practicable, the Secured Creditor will receive the unpaid portion of its Allowed Claim

General Unsecured Creditors in Class II will receive 50% on account of their Allowed Claims. On the Effective Date Holders of Claims in this Class will receive their Pro Rata Share of $300,000 to be Distributed to the Class. Then five (5) business days after the Debtor receives the rent payment from LIWEN commencing with the month first beginning after the Effective Date, each holder of an Allowed Unsecured Claim shall receive its Pro Rata share of $30,000 until such time as members in the Class shall receive 50% of their Allowed Claims. However, should the JASP Claim not be allowed, Class II creditors will receive 100% on account of their Allowed Claims following the same payment structure, except that on the Effective Date, they will receive their Pro Rata Share of $200,000, and thereafter their Pro Rata share of $30,000 per month until such time their Allowed Claims are paid in full. Furthermore, in the event of the exercise of the LIWEN Option, at the closing, or as soon thereafter as practicable, Class II Creditors will receive an amount equal to the unpaid portion of their Allowed Claims.

The Holder of the Suffolk County Unclassified Claim shall receive $40,000 per month commencing on the first day of the month beginning after the Effective Date of the Plan (or a lesser amount should the Allowed Amount of the Claim be less than $40,000) until such Claim shall have been paid in full. Payment shall include interest at the applicable statutory rate.[2]

### B. Summary Classification and Treatment of Claims and Interests Under the Plan

The classification and treatment of Claims and Interests is without prejudice to a Holder asserting that it is entitled to a different classification or treatment. The amounts shown below constitute, to the best of the Debtor's knowledge, an estimate of the amount of such Claims,

---

[1] As set forth in Article 1.31 of the Plan, the "Effective Date" is "[t]he first Business Day on which each condition set forth in Article IX of the Plan has been satisfied or waived. The conditions set forth in Article IX of the Plan include (1) the entry of a final, non-appealable order confirming the Plan in form and substance reasonably satisfactory to the Debtor, and (2) the commencement of distributions under the Plan required to be made on or about the Effective Date.

[2] Annexed hereto as Exhibit B is a cash flow projection showing the Debtor's ability to make the payments contemplated under the Plan together with a copy of the Debtor's balance sheet.

taking into account amounts, if any, paid or projected to be paid before the Effective Date.

**THIS IS ONLY A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. THE PLAN INCLUDES OTHER PROVISIONS THAT MAY AFFECT YOUR RIGHTS. YOU ARE URGED TO READ THE PLAN IN ITS ENTIRETY BEFORE VOTING ON THE PLAN.**

**1. (a) General Unclassified Claims Against the Debtor**

In accordance with section 1123(a)(1) of the Bankruptcy Code, unclassified Claims against the Debtor consist of Administrative Claims, Priority Non-Tax Claims, Priority Tax Claims and the Suffolk County Unclassified Claim. The Debtor estimates that the amounts of such Claims as of the Effective Date will be approximately as follows:

| | |
|---|---|
| Administrative Claims | Administrative Claims consisting largely of unpaid Professional fees and expenses of approximately [$150,000] |
| Priority Non-Tax Claims | $0 |
| Priority Tax Claims | $1,484.84 (approximately) |
| Suffolk County Unclassified Claim | $165,834.09 (approximately) |

**(b) Allowance and Payment of Administrative Claims**

The Holder of any Administrative Claim that is incurred, accrued or in existence prior to the Effective Date, other than one incurred in the ordinary course of the Debtor's business must file with the Bankruptcy Court and serve on all parties required to receive such notice a request for the allowance of such Administrative Claim on or before sixty (60) days after the Effective Date. Such request must include at a minimum (a) the name of the Holder of the Claim, (b) the amount of the Claim, and (c) the basis of the Claim. Failure to timely file the request required may result in the Administrative Claim being forever barred and discharged. Objections to such requests must be filed and served pursuant to the Federal Rules of Bankruptcy Procedure and applicable rules of the Bankruptcy Court on the requesting party and Commack within fifteen (15) days after the filing of the applicable request for payment of an Administrative Claim.

Except for Administrative Claims of Professionals, an Administrative Claim with respect to which a request for payment is required and has been properly filed pursuant to the Plan shall become an Allowed Administrative Claim if no timely objection is filed. If a timely objection is filed, the Administrative Claim shall become an Allowed Administrative Claim only to the extent Allowed by a Final Order. An Administrative Claim for Professional fees, and with respect to which a fee application has been properly filed and served, shall become an Allowed Administrative Claim only to the extent Allowed by a Final Order.

Other than the Suffolk County Unclassified Claim, except to the extent that a Holder of an Allowed Administrative Claim has been paid on or prior to the Effective Date, or agrees to a different treatment, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction, release and discharge of and exchange for such Administrative Claim, and after the application of any retainer or deposit held by such Holder, Cash equal to the Allowed amount of such Administrative Claim within ten (10) Business Days after the allowance date with respect to such Allowed Administrative Claim.

Holders of Administrative Claims based on liabilities incurred in the ordinary course of business during the Bankruptcy Case (other than Claims of governmental units for taxes or Claims and/or penalties related to such taxes, or alleged Administrative Claims arising in tort) shall not be required to file any request for payment of such Claims. Each Administrative Claim incurred in the ordinary course of business of the Debtor will be paid by the Debtor on or about the Effective Date. All objections to Administrative Claims made by the Debtor prior to the Effective Date shall subsequent to the Effective Date be prosecuted by the Debtor which shall withhold payment of such Claim until such time as any objection is resolved pursuant to a settlement or a Final Order.

**(c) Allowance and Payment of Priority Claims including the Suffolk County Unclassified Claim**

Under the Plan, the Holder of the Suffolk County Unclassified Claim shall receive $40,000 per month commencing on the first day of the month beginning after the Effective Date of the Plan (or a lesser amount should the Allowed Amount of the Claim be less than $40,000) until such Claim shall have been paid in full. All other Priority Claims, if any, shall be paid in full in Cash on the Effective Date or a soon as practicable thereafter.

**(d) U.S Trustee Fees**

The Debtor shall timely pay to the United States Trustee all quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6) until the Bankruptcy Case is closed or dismissed. The Debtor shall serve on the United States Trustee a quarterly financial report for each quarter (or portion thereof) after the Effective Date while the Bankruptcy Case remains open.

2. **Classified Claims and Interests**

The following are estimates of the numbers and amounts of classified Claims and Interests under the Plan.

**Nothing herein shall be dispositive of the allowance of any Claim or Interest or constitute a waiver by the Proponent or any other party of the right to object to such Claim or Interest. The Proponent is not stipulating to the validity or amount of any Claim or Interest for which estimates are provided herein. The amounts set forth herein are estimates based upon the Proponent's best estimate of the amount due.**

| **Class** | **Number of Holders and** | **Treatment** |
|---|---|---|

| | **Estimated Aggregate Allowed Claims** | |
|---|---|---|
| Class I | One Holder (Stabilis); $10,326,049.23[3] | (i) Upon Effective Date, receipt of Available Cash of approximately $[700,000], which shall reduce the Allowed Claim.<br><br>(ii) Monthly payments of $100,000 per month for 60 months; at the end of 60 months, full payment of the balance of the Allowed Claim plus any accrued and unpaid interest.<br><br>(iii) interest on the amount of the Allowed Claim from and after the Effective Date at the rate of 4.5% per annum, with each monthly payment to be applied to principal and interest based upon a thirty (30) year self-amortizing loan. To the extent monthly payments exceed the amount required on such an amortization schedule, the excess amounts shall be applied to principal reduction.<br><br>(iv) The Holder of the Claim to retain its lien on the Property.<br><br>(v) In the event of a sale of the Property pursuant to the LIWEN Option, an amount equal to the then unpaid portion of the Allowed Secured Claim shall be paid. |

[3] This is the amount the then Holder of the Claim alleged was due as of March 31, 2013 less payments made on account of the Claim after that date.

| | | |
|---|---|---|
| Class II | Approximately 33 Holders; $1,490,026.07[4] (approximately) | (i) $300,000 on the Effective Date to be distributed Pro Rata to Class members and then commencing with the month first beginning after the Effective Date, each Holder of an Allowed Unsecured Claim shall receive its Pro Rata share of $30,000 until such time as the Holder shall have received aggregate payments on account of its Claim equal 50% of its Allowed Claim<br><br>(ii) In the event the JASP Claim is not allowed, $200,000 on the Effective Date to be distributed Pro Rata to Class members and then commencing with the month first beginning after the Effective Date, each Holder of an Allowed Unsecured Claim shall receive its Pro Rata share of $30,000 until such time as the Holder shall have received aggregate payments on account of its Claim equal 100% of its Allowed Claim<br><br>(iii) In the event of a sale of the Property pursuant to the LIWEN Option, an amount equal to the then unpaid amount of their then Allowed Claim shall be paid. |
| Class III | Interest Holders | Members of the Debtor will retain their membership interests in the Debtor. |

[4] This estimate includes disputed, contingent and/or unliquidated Claims. Furthermore, this estimate excludes the unsecured Claims of JASP Commack Management LLC and 26th Commack Management, LLC (collectively, "JASP") which the Debtor scheduled as disputed and unliquidated in the amount of $1,600,000. JASP has not filed a proof of claim and the Bar Date has now passed. *See infra* at V.D.

## V. HISTORY OF DEBTOR AND OVERVIEW; MEANS FOR IMPLEMENTATION OF THE PLAN

### A. Pre-petition History of Debtor

Commack acquired the Property in 2000. An affiliate constructed the building now on the Property and the Debtor opened a Wingate hotel at the site in December, 2003. Construction was financed by equity contributions of members of the Debtor and a loan from Independence Community Bank for $6.7 million. The total cost to complete the hotel was $12.5 million. Upon completion, General Electric Capital Commercial of Utah, LLC ("GECC"), under a "forward commitment" that it made to the Debtor, replaced the construction financing with a permanent mortgage loan of $7.5 million. From the time it acquired the Property through approximately February, 2013 the Debtor operated a transient motel under the Wingate "flag." In August, 2008, the Debtor refinanced its loan with GECC, which by then had a reduced principal balance of approximately $6.1 million. The new loan with GECC was for $10.9 million and a substantial portion of the fresh advance was used to redeem certain membership interests in the Debtor and to satisfy other obligations.

The Debtor's timing on the refinancing could not have been worse. While the hotel had operated successfully since its opening, within weeks of the closing on the refinancing, Lehman Brothers filed its bankruptcy petition, the world financial system edged close to a full collapse, Congress passed the Troubled Asset Recovery Plan and the major United States stock indices lost between thirty and forty percent of their value over the next several months. Neither the Debtor specifically nor the hospitality industry generally, were immune from these events and over the next four years the Debtor struggled to reach pre-2008 revenue levels.

Despite this most challenging of environments, the Debtor never once missed making a monthly mortgage payment. The reduction in income, however, did trigger covenant defaults with GECC, resulting in two loan modifications, one dated August 31, 2010 and a second dated January 23, 2012. The material changes to the loan included an increase in the interest rate, extension of the loan maturity date to March 31, 2013 and a waiver of the covenant defaults.

In January 2012, GECC notified Commack that it would not agree to further extend the loan's maturity date. Hotel operations had not rebounded from the effects of the recession and the Debtor was still struggling to meet its current obligations; indeed it had fallen in arrears on its real property taxes. In the Debtor's view, market conditions and its reduced revenue and earnings before interest, taxes, depreciation and amortization ("EBITDA") would make it extraordinarily difficult to refinance the GECC loan; and so management explored alternative strategies to increase cash flow and the Property's value.

On or about March 19, 2013, after substantial negotiations, the Debtor executed a five-year lease ("the Lease") with the Long Island Women's Empowerment Network or LIWEN. LIWEN had been awarded a contract with Suffolk County to operate a temporary shelter for homeless families prior to Hurricane Sandy, but the need for the facility became acute as a result of the hurricane. LIWEN's directive included locating a facility where homeless families could be sheltered temporarily, generally no more than sixty to ninety days, and where counseling services could be provided until more permanent housing could be secured.

Debtor and its management considered the Lease with LIWEN to be an extraordinary achievement. Because it was implicitly backed by Suffolk County, it provided a sound basis to conclude that the rent would be paid. LIWEN also agreed to pay all of the costs of operating and maintaining the Property, other than real estate taxes, committed to monthly rent beginning at $228,000 per month for the first year which increased in the fifth and final year to $251,780.19 per month.[5] After payment of real estate taxes and a monthly management fee, Commack anticipated monthly cash flow for the first year of the Lease to be about $160,000 or twice the debt service due under the GECC loan.

When Commack signed the Lease, it separately granted LIWEN an option to purchase the Property. The initial option price was $13,900,000 or approximately $3.6 million more than the maturity date amount of the GECC loan. This option price increased over time. Thus if LIWEN acquired the Property more than eleven months after it took possession of the Property under the Lease, the exercise price was $14,750,000. The current option price is $15,200,000.

Commack informed GECC of its discussions with LIWEN, the proposed terms of the Lease and when the Lease was signed, of that fact. GECC opposed leasing the Property to LIWEN, although it never offered a reason why and within days of signing the Lease, GECC commenced a foreclosure action in the New York Supreme Court, Suffolk County.

Simultaneously with the commencement of the foreclosure action, GECC moved for a temporary restraining order and a preliminary injunction to enjoin the Debtor from performing under the Lease and to bar LIWEN from taking possession. Characterizing Commack's execution of the Lease as "brazen," GECC claimed that the Lease would diminish the Property's value, that the Property's new use "constitute[d] a waste" and that the use of the Property by LIWEN in furtherance of its contract would "violate public policy because Defendant's conduct would cause direct harm to homeless families and victims of domestic violence." The New York Supreme Court denied GECC's motion and since taking possession LIWEN has paid more than $1,100,000 in rent.

Commack contends that GECC had acted in bad faith and with its answer to the complaint asserted several counterclaims for a breach of its covenants of good faith and fair dealing implied in all New York contracts. Commack also alleged that GECC breached its agreements by (1) insisting that the Property could only be used as a motel operating under the Wingate name even though it was indisputable that this was not economically feasible; (ii) interfering with and impeding the Debtor's ability to timely perform under the Lease even though the proceeds under the Lease would provide substantial income to the Debtor as opposed to losses under the Wingate "flag;" and (iii) failing to provide a good faith economically rational basis for its position. Commack contended that the frustrating of its efforts to put the Property to its highest and best use was part of a GECC plan to capture the Property and the equity value above the mortgage lien to the exclusion of Commack and its unsecured creditors.

On or about June 28, 2013, GECC sold its mortgage lien rights and the note executed by Commack to Stabilis for an undisclosed amount but which Commack believes was less than the $10,326,049.23 GECC contended, in a "Notice of Default and Demand for Payment" sent to

[5] Prior to the maturity of the GECC loan, monthly debt service was approximately $80,000 per month.

Commack, was due as of March 31, 2013. Stabilis has continued GECC's foreclosure action and successfully obtained the appointment of a "rent receiver" who, as of the Petition Date, was holding approximately $630,000 in lease payments. On or about January 17, 2014, Stabilis moved for summary judgment; Commack's time to respond to the motion had not yet run as of the Filing Date.

## B. The LIWEN Lease and LIWEN's Contract with Suffolk County

The LIWEN Lease has a five-year term ending in April 2018. As of April 2014, LIWEN pays the Debtor basic monthly rent of $233,600, which rent increases annually pursuant to a schedule set forth in the Lease. Furthermore, LIWEN is responsible for the payment of all costs of operating and maintaining the Property other than real estate taxes Since taking possession of the Property LIWEN has provided payment of more than $1,100,000 in rent.

LIWEN is a not-for-profit company whose mission is to help deprived, abused, disadvantaged, and disabled women and their children to become self-sufficient, financially independent and productive individuals in society. In January 2013, LIWEN executed a two-year contract with the Suffolk County Department of Social Services for the purpose of making emergency housing services available in Suffolk County. The contract term expires on June 30, 2015, and the County has the sole right to renew the contract for two one-year extensions, through June 30, 2017.

Although there is the possibility that Suffolk County may not renew its contract with LIWEN, LIWEN has informed the Debtor that it is confident the contract will be renewed. Representatives of LIWEN have advised the Debtor that its program with the Suffolk County Department of Social Services is in full force and effect and is meeting or exceeding the expectations of the parties. The Property shelters one of the largest populations of families without permanent housing under the program run by Suffolk County, of which LIWEN is a significant vendor. Currently, the Property is at or near capacity. LIWEN has also advised the Debtor that the need for the type of temporary family housing it provides has not abated and it foresees this situation to continue for years to come.

In addition, LIWEN has informed the Debtor that it is in the process of applying to New York State for grants and additional funding and is similarly confident that its application will be approved. In the unlikely event that Suffolk County decides not to renew its agreement, LIWEN expects to continue providing its essential services for families in need through alternative funding sources which could include grants from or contracts with New York State, private parties and charitable foundations.

## C. The Stipulation Providing for Turnover of Funds By Receiver and Adequate Protection

After the Filing Date, the Debtor and Stabilis executed a Stipulation (the "Turnover Stipulation") that provides for the turnover of funds held by the rent receiver and the use of those funds, which constitute Stabilis's cash collateral within the meaning of 11 U.S.C. § 636(a), to make adequate protection payments to Stabilis to be applied to reduce Stabilis's claim and for the payment of property taxes. The Debtor submitted a motion for approval of the Turnover

Stipulation (*see* Docket No. 24) which is scheduled to be heard by the Bankruptcy Court on April 23, 2014.

## D. **The JASP Claim**

The Debtor's largest unsecured creditor is 26th Commack Management LLC and its managing member, JASP Commack Management LLC (collectively "JASP"). The Debtor has scheduled JASP's claim as a disputed, unliquidated claim in the amount of $1.6 million. The claim arises out of a contract between the Debtor and JASP dated as of April 19, 2013 pursuant to which JASP was to "manage" the Debtor's interests in the Property through March 31, 2018, the date the LIWEN lease expires. This management agreement provided for an "initial monthly fee through the end of the 2012-2013 taxable year of $63,470.00" which would thereafter be "adjusted annually accounting for increases and decreases in the yearly tax bill" for the Property and would be subject to "annual 4% increase, commensurate with the rent increase in the same percentage under the terms of the Amendment to lease."

In order to secure payment of the fees to be paid pursuant to the agreement, the Debtor gave JASP a partial assignment of the rents it was to receive from LIWEN ("The fees for the services to be provided by the MANAGER to CHLLC [the Debtor], as described in Section 7, below is hereby assigned to Manager out of the rents that are due as per the Lease"). However should LIWEN default in the payment of rent, JASP would have no recourse to the Debtor for the fees attributable to the months for which rent was not paid. The Debtor has not made any payments to JASP under the management agreement.

In November 2013, JASP moved to intervene in the GECC foreclosure action. In support of its motion, it filed pleadings and affidavits in which it alleged that it provided almost one million dollars in improvements to the Property "and assumed building management duties so that LIWEN could operate it as a women's shelter." JASP claimed that because the Debtor failed to meet its obligations to make improvements necessary for LIWEN's occupancy, it funded the improvements with the understanding that LIWEN would receive a rent abatement in the amount of the cost of the improvements. The abated rents were intended as the source of the repayment by LIWEN to JASP.

JASP further alleged, however, that given the multi-party relationships and the nature of LIWEN's funding from Suffolk County, a formal abatement of rent would not work and so the parties agreed to the assignment concept in order to secure repayment of the sums it advanced. In those same pleadings, JASP claims it is owed $988,430.00.

Notably, JASP failed to file a proof of its claim by the May 27, 2014 (the "Bar Date") deadline for non-governmental creditors to assert prepetition claims against the Debtor in this case. (*See Order Establishing Deadline for Filing Proofs of Claim and Directing the Form and Manner of Notice* [Docket No. 17] (the "Bar Date Order").) Because the Debtor scheduled JASP's claim as disputed and unliquidated, the Debtor anticipates that the JASP Claim will be disallowed in its entirety prior to the Effective Date.

**E. Means of Implementation of the Plan**

The Plan provides that Commack shall retain and continue in the management of its Property. The current managing members of the Debtor, Viral Patel and Nilesh Patel, will retain their positions as managing members of Commack and will be responsible for the business operations of the Debtor. The cash needed to pay Allowed Claims and Allowed Administrative Expenses and all other payments due under the Plan shall come from the proceeds of the LIWEN Lease.

**F. Discharge**

**The Plan shall provide that all considerations distributed thereunder will be in exchange for, and in complete satisfaction, settlement, discharge and release of all Claims against, and Interests, in the Debtor, of any nature whatsoever, whether known or unknown, or against the assets or properties of Debtor, that arose before the Effective Date except as otherwise provided in the Bankruptcy Code, the Plan or the Confirmation Order. Except as provided in the Bankruptcy Code, the Plan or the Confirmation Order, upon the Effective Date, entry of the Confirmation Order acts as a discharge and release under Bankruptcy Code Section 1141(d)(1)(A) of all Claims against and Interest in the Debtor and its Assets arising at any time before the Effective Date regardless of whether a Proof of Claim or Interest was filed, whether the Claim or Interest is Allowed, or whether the Holder of the Claim or Interest votes to accept the Plan or is entitled to receive a Distribution under the Plan. Except as provided in the Plan or the Confirmation Order, upon the Effective Date, any Holder of a Discharged Claim or interest shall be precluded from asserting against the Debtor or any Assets of the Debtor any other or further Claim or Interest based on any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred before the Effective Date. Except as provided in the Plan or the Confirmation Order, and subject to the occurrence of the Effective Date, the Confirmation Order will be a judicial determination of discharge of all liabilities of the Debtor to the extent allowed under Bankruptcy Code Section 1141 and the Debtor shall not be liable for any Claims or Interest and will only have the obligations as are specifically provided for in the Plan.**

**G. Injunction**

**Except as otherwise provided in the Plan, the Confirmation Order shall provide that from and after the Effective Date, all Holders of Claims against and Interests in the Debtor are permanently enjoined from taking any of the following actions against the Debtor: (a) commencing or continuing in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any encumbrance or lien; (d) asserting a setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor; and (e) commencing or continuing, in any manner or in any place, any action that does not conform to or comply with, or is inconsistent with, the provisions of the Plan; provided, however, that nothing contained herein shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of the Plan or the Confirmation Order. If allowed by the Bankruptcy Court, any Person injured**

**by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.**

**H. Exculpation**

**To the greatest extent permissible by law, the Debtor and its respective members, managers, partners, officers, directors, employees and agents (including any attorneys retained by such Persons) shall have no liability to any Holder of any Claim or Equity Interest for any act or omission in connection with, or arising out of, the Chapter 11 Case, the Plan, the Disclosure Statement, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence as determined by a Final Order of the Bankruptcy Court and, in all respects, shall be entitled to rely on the advice of counsel with respect to their duties and responsibilities under the Plan.**

**I. Term of Bankruptcy Injunction or Stays**

Unless otherwise provided herein or an order of the Bankruptcy Court (including without limitation the Confirmation Order), all injunctions or stays provided in the Bankruptcy Cases under Bankruptcy Code section 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. Upon the Effective Date, the injunction provided in the Plan shall be effective.

**J. Executory Contracts**

As of Confirmation, and conditioned on the occurrence of the Effective Date, the LIWEN Lease shall be assumed unless otherwise previously assumed by order of the Bankruptcy Court. All other executory contracts shall be deemed rejected on Confirmation.

## VI. CONFIRMATION OF THE PLAN

**A. Solicitation of Votes; Voting Procedures**

**1. Ballots and Voting Deadline**

A Ballot to be used for voting to accept or reject the Plan is enclosed with all copies of this Disclosure Statement mailed to all Holders of Claims and Interests entitled to vote. BEFORE COMPLETING YOUR BALLOT, PLEASE READ CAREFULLY THE INSTRUCTION SHEET THAT ACCOMPANIES THE BALLOT.

**The Bankruptcy Court has directed that in order to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be received no later than 5:00 p.m. Eastern Time on _____________, 2014, at the following address:**

**Commack Balloting Agent**
**Cole, Schotz, Meisel, Forman & Leonard, P.A.**
**900 Third Avenue**

**16th Floor**
**New York, NY 10022**
**Attn: Mark Tsukerman, Esq.**

**YOUR BALLOT MAY NOT BE COUNTED IF IT IS RECEIVED AT THE ABOVE ADDRESS OR FAX NUMBER AFTER 5:00 P.M. EASTERN TIME ON _____________, 2014.**

**2. Parties in Interest Entitled to Vote**

Any Holder of a Claim or an Interest as of the date on which the Disclosure Statement Order was entered and whose Claim or Interest has not previously been disallowed by the Bankruptcy Court is entitled to vote to accept or reject the Plan, if such Claim or Interest is impaired under the Plan and either (a) such Holder's Claim has been scheduled by a Debtor (and such Claim is not scheduled as disputed, contingent, or unliquidated), or (b) such Holder has filed a proof of Claim or proof of Interest on or before the applicable bar date.[6] Any Claim or Interest as to which an objection has been filed is not entitled to vote unless the Bankruptcy Court, upon application of the Holder to whose Claim or Interest an objection has been made, temporarily allows such Claim or Interest in an amount that it deems proper for the purpose of voting to accept or reject the Plan. Any such application must be heard and determined by the Bankruptcy Court on or before commencement of the Confirmation Hearing. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**3. Definition of Impairment**

As set forth in section 1124 of the Bankruptcy Code, a class of claims or equity interests is impaired under a plan of reorganization unless, with respect to each claim or equity interest of such class, the plan:

(a) leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or equity interest; or

(b) notwithstanding any contractual provision or applicable law that entitles the holder of a claim or equity interest to demand or receive accelerated payment of such claim or equity interest after the occurrence of a default: cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code;

(c) reinstates the maturity of such claim or interest as it existed before such default;

(d) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; and

[6] If a Holder did not file a proof of Claim or Interest on or before the applicable bar date, but such Holder subsequently obtained an order from the Bankruptcy Court allowing the Holder to file a proof of Claim or Interest thereafter, such Holder will be entitled to vote to accept or reject the Plan.

(e) does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

**4. Classes Impaired Under the Plan**

Classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Accordingly, acceptances of a plan will be solicited only from those persons who hold claims or equity interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity or payment in full in Cash.

Claims against the Debtor in Classes I and II are impaired under the Plan and the Holders of those Claims are entitled to vote on the Plan. Holders of Interests in the Debtor are not impaired under the Plan and are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f) and are thus not entitled to vote on the Plan.

Administrative Claims, the Suffolk County Unclassified Claim and Priority Non-Tax Claims are unclassified. Their treatment as set forth in the Plan is as permitted under the Bankruptcy Code.

**5. Vote Required For Class Acceptance**

Under the Bankruptcy Code, a Class of Claims that is entitled to vote to accept or reject the Plan shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.

**B. <u>Confirmation Hearing</u>**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. By order of the Bankruptcy Court, **the Confirmation Hearing on the Plan has been scheduled to commence on _____________, 2014 at _________ ___.m. Eastern Time** in the United States Bankruptcy Court for the Eastern District of New York. The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. **Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court on or before _____ ___.m. Eastern Time on ___________ 2014**, at the following address:

Clerk - United States Bankruptcy Court
Eastern District of New York
Alfonso M. D'Amato Federal Courthouse
290 Federal Plaza

Central Islip, NY 11722

In addition, any such objection must be served upon the following parties, together with proof of service, so that they are ***received*** **by such parties on or before _____ ___.m. Eastern Time on ______________, 2014**:

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Laurence May, Esq.
Mark Tsukerman, Esq.
900 Third Avenue
New York, NY 10022
(212) 752-8000
Fax: (212) 752-8393

**COUNSEL FOR COMMACK HOSPITALITY, LLC**

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and the Order Approving Disclosure Statement and Setting Deadline for Objections. **UNLESS AN OBJECTION TO CONFIRMATION IS SERVED AND FILED ON THE PROPONENTS, THROUGH THEIR COUNSEL SO THAT IT IS ACTUALLY RECEIVED BY NO LATER THAN _____ _____.M. EASTERN TIME ON _______________, 2014, THE BANKRUPTCY COURT MAY NOT CONSIDER IT.**

## C. Requirements For Confirmation of a Plan

At the Confirmation Hearing, the Bankruptcy Court must determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. As set forth in section 1129 of the Bankruptcy Code, these requirements are as follows:

1. The plan complies with the applicable provisions of the Bankruptcy Code.

2. The proponent of the plan complied with the applicable provisions of the Bankruptcy Code.

3. The plan has been proposed in good faith and not by any means forbidden by law.

4. Any payment made or promised by the debtors, by the plan proponents, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

5. (a) (i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(b) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtors, and the nature of any compensation for such insider.

6. Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

7. With respect to each impaired class of claims or interests:

(a) each holder of a claim or interest of such class has accepted the plan or will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code on such date; or

(b) if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, the holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

8. With respect to each class of claims or interests:

(a) such class has accepted the plan; or

(b) such class is not impaired under the plan.

9. Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

(a) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b) with respect to a class of claims of a kind specified in section

507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive:

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(c) with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of a claim will receive on account of such claim regular installment payments in cash –

(i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b); and

(d) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as described in subparagraph (c) above.

10. If a class of claims is impaired under the plan, at least one class of claims that is impaired has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim of such class.

11. Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

12. All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payments of all such fees on the effective date of the plan.

13. The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated

itself to provide such benefits.

The Proponent believes that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all the requirements of chapter 11.

**D. Cramdown**

In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Proponent if, as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to that Class. A plan of reorganization "does not discriminate unfairly" within the meaning of the Bankruptcy Code if no Class receives more than it is legally entitled to receive for its claims or equity interests.

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims and interests. As set forth in section 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

1. With respect to a class of *secured claims*, the plan provides:

(a) (i) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

(c) the realization by such holders of the "indubitable equivalent" of such claims.

2. With respect to a class of *unsecured claims*, the plan provides:

(a) that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or

interest any property.

3. With respect to a class of *equity interests*, the plan provides:

(a) that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(b) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

In the event that any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired Class of Claims or Interests. The Proponent believes the Plan does not discriminate unfairly against, and is fair and equitable with respect to, each impaired Class of Claims or Interests and, thus, that the Plan may be confirmed under the applicable "cramdown" standards if necessary.

## VII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Proponent believes the most likely alternative to Confirmation and consummation of the Plan would be a continuation of Stabilis's foreclosure suit against the Property. While the Proponent will not speculate on the outcome of the suit, should Stabilis be successful, at a foreclosure sale the Debtor does not believe that sufficient monies will be generated to pay any distributions to Class II Holders.

Alternatively, the Case could be converted to a case under Chapter 7 of the Bankruptcy Code and a trustee appointed to liquidate the Assets. As set forth in the liquidation analysis annexed hereto as Exhibit C, the Proponent does not believe that the outcome of a Chapter 7 case will differ materially from the circumstances where the stay is lifted and the Property is sold in a New York State foreclosure proceeding. In both instances unsecured creditors will receive no distributions on account of their Claims.

## VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, you are hereby notified that: (a) any discussion of U.S. federal tax issues in this Disclosure Statement is not intended or written be relied upon, and cannot be relied upon, by creditors for the purpose of avoiding penalties that may be imposed on such creditors under the Internal Revenue Code; (b) such discussion is not written in connection with the promotion or marketing of the transactions or matters addressed herein; and (c) each creditor should seek advice based on its particular circumstances from an independent tax advisor.**

### A. General

The following discussion addresses certain United States federal income tax consequences of the consummation of the Plan. This discussion is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), existing and proposed regulations there under, current administrative rulings, and judicial decisions as in effect on the date hereof, all of which are subject to change, possibly retroactively. No rulings or determinations by the Internal Revenue Service have been obtained or sought by the Debtor with respect to the Plan.

An opinion of counsel has not been obtained with respect to the tax aspects of the Plan. This discussion does not purport to address the federal income tax consequences of the Plan to particular classes of taxpayers (such as foreign persons, S corporations, mutual funds, small business investment companies, regulated investment companies, broker-dealers, insurance companies, tax-exempt organizations and financial institutions) or the state, local or foreign income and other tax consequences of the Plan.

NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST. SUBSTANTIAL UNCERTAINTY EXISTS WITH RESPECT TO THE TAX ISSUES DISCUSSED BELOW. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

### B. Certain U.S. Federal Tax Consequences to the Debtor

The Debtor's business is operated through a limited liability company (the "LLC"). Based upon discussions with the Debtor, the LLC is a "disregarded entity" for income tax purposes and therefore, it pays no income tax and the income or loss passes through and is reported entirely on the owners' tax returns. The Debtor does not owe any income taxes, and there are no past due employment taxes or other ancillary taxes, except as set forth above in this Disclosure Statement. As a result of this structure, the Debtor does not anticipate any federal or state tax consequences associated with implementing the Plan.

**C. Certain U.S. Federal Tax Consequences to the Holders of Claims and Equity Interests**

A Holder of an Allowed Claim or Interest will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on a Claim but was not previously paid by the Debtor or included in income by the Holder of the Allowed Claim or Equity Interest. A Holder of an Allowed Claim or Interest will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Claim and the amount realized by the Holder upon consummation of the Plan that is not attributable to accrued but unpaid interest. The amount realized will equal the sum of Cash and the fair market value of other consideration received (or to be received). The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the Holder of the Claim, the nature of the Claim or Equity Interest in its hands, whether the Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the Claim, and the creditor's holding period of the Claim or Interest. If the Claim or Interest in the creditor's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the Holder of the Claim is a non-corporate taxpayer and held such Claim or Interest for longer than one year or short-term capital gain or loss if the Holder of the Claim held such Claim or Interest for less than one year.

A Holder of an Allowed Claim or Interest who receives, in respect of its Claim, an amount that is less than its tax basis in such Claim or Interest may be entitled to a bad debt deduction if either: (i) the Holder is a corporation; or (ii) the Claim or Interest constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the Holder or (b) a debt the loss from the worthlessness of which is incurred in the Holder's trade or business. A Holder that has previously recognized a loss or deduction in respect of its Claim or Interest may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Claim or Interest. Holders of Claims or Interests who were not previously required to include any accrued but unpaid interest with respect to in their gross income on a Claim or Interest may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. Holders previously required to include in their gross income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

**D. Importance of Obtaining Professional Tax Assistance**

The foregoing is intended to be only a summary of certain of the United States federal income tax consequences of the Plan and not a substitute for careful tax planning with a tax professional. Holders of Claims or Interests are strongly urged to consult with their own tax advisors regarding the federal, state, local and foreign income and other tax consequences of the Plan, including, in addition to the issues discussed above, whether a bad debt deduction may be available with respect to their Claims and, if so, when such deduction or loss would be available.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING DISCUSSION OF CERTAIN FEDERAL INCOME TAX

CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## IX. CONCLUSION

The Proponent urges Holders of Claims entitled to vote in the Plan to ACCEPT the Plan and evidence their acceptance by returning their Ballots so that they will be received by 5:00 p.m. Eastern Time on ____________________, 2014.

COMMACK HOSPITALITY, LLC

By: ________________________________
A Managing Member